# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

TRAVELERS PROPERTY CASUALTY )
COMPANY OF AMERICA, )
　　　　　　　　　　　　　　　 )
　　　　Plaintiff, )
　　　　　　　　　　　　　　　 )
v. )　　CIVIL ACTION 17-0041-WS-B
　　　　　　　　　　　　　　　 )
ALL-SOUTH SUBCONTRACTORS, INC., )
　　　　　　　　　　　　　　　 )
　　　　Defendant. )

## ORDER

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 40). The Motion has been briefed and is now ripe for disposition.[1]

## I.　Background.[2]

---

[1]　　As part of its submission, plaintiff filed a separate document styled a "Narrative Statement of Undisputed Facts" (doc. 42). Such a filing was not allowed by the Local Rules. *See* Civil L.R. 56(a) (summary judgment movant is to file a brief, all evidence relied upon, and in certain instances a proposed judgment, but "[n]o other supporting documents may be filed absent Court order"). Likewise, defendant filed an unauthorized separate document styled "All-South's Objection to Plaintiff's Evidentiary Submission" (doc. 52), which contests portions of plaintiff's Narrative Statement of Undisputed Facts. *See* Civil L.R. 56(b) (summary judgment non-movant is to file a responsive brief and all evidence relied upon, but "[n]o other supporting documents may be filed absent Court order"). In its discretion, the Court will accept and consider plaintiff's Narrative Statement of Undisputed Facts because the factual recitation therein closely tracks the statement of facts in plaintiff's principal brief, and there is no reason to believe that plaintiff filed a separate Narrative Statement as a means of circumventing applicable page limitations. Similarly, the Court in its discretion will accept and consider defendant's Objection because it does not appear to have been filed separately for purposes of evading page limitations.

[2]　　The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Thus, (Continued)

### A.    Nature of the Case.

On the evening of May 2, 2016, a heavy rainstorm swept through southwestern Alabama. Such weather events are not uncommon in this area; indeed, an oft-cited statistic crowns Mobile, Alabama as the rainiest city in the United States. Nonetheless, this weather event was significant. During the storm, the roof of a warehouse building owned by non-party Thompson Tractor Company in Spanish Fort, Alabama collapsed. The roof collapse damaged not only the warehouse facility, but also the Caterpillar tractor parts inventory stored inside. Thompson's insurer, plaintiff Travelers Property Casualty Company of America, investigated the loss and ultimately paid out over $1 million in insurance benefits to Thompson.

As subrogee under the applicable insurance policy, Travelers, standing in the shoes of its insured, filed suit against defendant All-South Subcontractors, Inc., to recover the insurance proceeds paid to Thompson. Travelers' theory is that All-South is responsible for Thompson's roof collapse because All-South had performed re-roofing services on that building in 2009-2010, and had responded to a service call from Thompson when the roof leaked in 2014. Travelers' Complaint (doc. 1) pleads the following claims against All-South: (i) negligence and negligence *per se*, alleging that All-South failed to exercise reasonable care in performing work on the Thompson roof (Count I); (ii) negligent misrepresentation, alleging that All-South falsely represented to Thompson the work that it would perform, as well as the standard and end results of that work (Count II); (iii) breach of contract, alleging that All-South breached its contract with Thompson by failing to inspect, maintain, repair and/or replace the subject roof as agreed (Count III); and (iv) breach of express and implied warranties, alleging that Thompson breached a 15-year express warranty on the subject roof, breached the promises and warranties contained in its

---

defendant's evidence is taken as true and all justifiable inferences are drawn in its favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [All-South]'s version of the facts drawing all justifiable inferences in [All-South]'s favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

advertising materials, and breached implied warranties of fitness and merchantability under Alabama law (Count IV).

Following the close of discovery, Travelers filed a Motion for Partial Summary Judgment seeking the following discrete rulings on issues pertaining to liability and causation: (i) the International Plumbing Code applied to All-South's work on the Thompson roof; (ii) in 2010, All-South breached its duty of care by failing to install scuppers as required by the International Plumbing Code; (iii) in 2014, All-South breached its duty of care (whether or not the International Plumbing Code applied) by failing to advise Thompson of the need for scuppers; and (iv) the lack of scuppers was a proximate cause of the roof collapse. For its part, All-South maintains that genuine issues of material fact remain on each of these issues, such that plaintiff's Motion for Partial Summary Judgment should be denied.

### B.     *The Warehouse Roof and the 2010 Re-Roofing Project.*

As of 2009, Thompson's warehouse had a metal roof that sloped downward to a three-foot parapet wall, whose function was to keep water from flowing off the side of the building. (Armstrong Dep. (doc. 43, Exh. B), at 23-24.) During storms, rainwater would flow down the roof and become trapped against the parapet wall, forming a large puddle. (*Id.* at 24, 84.) To manage the buildup of rainwater, the base of the wall was equipped with six evenly-spaced downspouts that drained water from an internal gutter situated along the bottom of the inside of the parapet wall. (*Id.* at 24; doc. 43, Exh. D, at #5.) The drainage system consisted of the gutter and downspouts. (Baxter Dep. (doc. 43, Exh. E), at 14.)

All-South Subcontractors is a roofing company, and is not licensed to practice engineering or architecture. (Doc. 53, Exh. BB, at 5.) On November 10, 2009, All-South submitted a bid proposal to perform roofing work on Thompson's warehouse. The scope of work identified in the proposal included the following: (i) "Install a Firestone 45 mil white TPO fully adhered roof system;" (ii) "Line the internal gutters with membrane;" and (iii) "Provide the owner with a manufacturer's fifteen (15) year labor and material warranty." (Doc. 43, Exh. A.) Also embedded in All-South's proposal was a statement reading, "We exclude any electrical, plumbing, mechanical or HVAC work." (*Id.*)[3] Thompson hired All-South to perform the

---

[3]     Defendant's evidence is that, as a matter of longstanding company policy, All-South instructs its employees not to give opinions on drainage to clients. (Stewart Dep. Vol. I (Continued)

warehouse re-roofing job; however, neither Thompson nor All-South consulted with professional engineers or architects in connection with this project. (Doc. 53, Exh. BB, at 5.) All-South performed the re-roofing work at Thompson in early 2010. In summary, the work performed consisted of the following: "The Firestone 45 mil TPO membrane roof was installed over insulation which had been placed on top of the metal roof and on top of fiber board which was mechanically secured by screws. The TPO material was then welded to the fiber board." (Doc. 43, Exh. D, at #3.)[4]

During this job, All-South discovered that the internal gutter on the Thompson roof "was full of trash, debris, pine straw, weeds growing in it, air conditioner filters, what have you." (Goldman Dep. (doc. 48, Exh. J), at 47.) All-South further determined that it would be necessary to install drain inserts in the downspouts because the TPO membrane that All-South was installing could not be welded to the gutter material. (*Id.* at 48, 50-51, 80.) On that basis, All-South elected to fill in the internal gutter with solid material in order to lay the TPO membrane on top of it. (Doc. 43, Exh. D, at #6.) All-South also fabricated and installed six drain inserts, one for each of the six existing downspouts. (*Id.* at #8, #11.) The drain inserts were sized and fabricated based upon existing dimensions of galvanized metal collars to which each downspout was attached. (*Id.* at #8-#9.) The inserts were fabricated from a TPO clad metal, and the roof was welded to them. (Goldman Dep., at 80.) All-South acknowledges that it "minimally decreased the size of the downspouts by putting the inserts in there." (Stewart Dep. Vol. I, at 57.) All-South also welded two straps of TPO material to the roof membrane above each drain screen in order to hold the screen in place. (Doc. 43, Exh. D, at #12.) The screens were intended to prevent debris from entering the downspouts. All-South also installed five crickets underneath the surface of the membrane "in between the drains to make the water flow." (*Id.* at #7;

---

(doc. 48, Exh. G), at 89.) All-South explains that the reason for such a policy is that "we're not trained to do that." (*Id.* at 90.) According to All-South, "drainage is plumbing, it's in the plumbing code, so we would exclude it. We don't even have a license to do that …." (*Id.* at 92.) As a company, All-South simply does not "provide any advice or recommendations to customers with respect to any drainage issues." (*Id.* at 55-56.)

[4]      The parties' filings liberally use the term "TPO membrane" without defining it. The Court understands that a TPO membrane is a widely used third-party commercial roofing product whose features include a durable, flexible reflective sheet with heat-welded seams.

Goldman Dep., at 49.)[5]  The scope of work to which All-South and Thompson had agreed made no mention of the crickets, the in-fill of the gutter, or the fabrication and installation of drainage inserts.  (Barter Dep. (doc. 43, Exh. F), at 111.)

Of central importance to Travelers' Motion for Partial Summary Judgment, a scupper is defined as "[a]n opening in a wall or parapet that allows water to drain from a roof."  (Doc. 43, Exh. J, at § 1502.)  Scuppers are essentially "holes in the wall" that act as "overflow devices," so that when "[w]ater builds up on the roof to a certain level, … it exits through the scuppers." (Barter Dep., at 56.)  In the context of Thompson's warehouse roof, the idea is that scuppers (*i.e.*, holes above the roof line in the parapet wall) could have acted as secondary drainage, a sort of failsafe system, if for any reason the existing drains, drain inserts and downspouts along the base of the parapet wall were to become clogged and standing water were to rise above the roofline against the wall.  The parapet wall on the roof of the Thompson warehouse did not have scuppers prior to All-South's re-roofing work in January 2010.  (*Id.* at 57.)[6]  Thus, the only way for rainwater to drain from the roof was through the six drain inserts being installed by All-South. (Doc. 43, Exh. D at #23.)  All-South did not install scuppers in the parapet wall in conjunction with the January 2010 project.  (Barter Dep., at 57; doc. 11, at #14.)

### C.     The March 2014 Rain Event.

On March 28, 2014, Thompson called All-South to report a significant roof leak at the warehouse.  (Doc. 43, Exh. L.)  An All-South crew visited Thompson's facility and inspected the roof, where their notes confirm they discovered "all six drains 100% plugged," "water over a foot deep at rear wall," and that water had "overflowed vent stacks," thereby entering the

---

[5]     In its principal brief, Travelers cites deposition testimony for the proposition that a cricket is "a little hill underneath the membrane" that diverts or guides water over to a drain. (Doc. 42, at 3.)  The cited deposition pages were omitted from plaintiff's evidentiary submission. Nonetheless, All-South has not objected to that characterization of the function of a cricket, and its employee testified that "[a] cricket is you build up insulation to control the flow of water. … [A] cricket just directs the flow of water" to the drains.  (Goldman Dep., at 63-54, 131.)

[6]     According to All-South expert Richard Baxter, the lack of scuppers on the Thompson roof at the time of its construction (some 30 years ago) was a blatant building code violation.  (Baxter Dep., at 68-69.)  As All-South expert Marc Barter explained, "The code required scuppers, and it was built without them."  (Barter Dep., at 76.)  The original designer and builder of the roof are not parties to this dispute.

warehouse.  (*Id.*)  Based on these conditions, All-South's crew "waded out," "removed debris," and "cleaned debris out" of the clogged drains.  (*Id.*)  When All-South employees cleaned out the drains, "a tremendous amount of water" gushed out through the downspouts to the ground below. (Robinson Dep. (doc. 43, Exh. G), at 22.)  The drains were found to contain "[a] lot of debris, a lot of vegetation had been pulled out, there was dirt, just numerous things."  (*Id.* at 25.)  At the conclusion of this service call, All-South field representatives met with Thompson's manager, reported their findings that all six rooftop drains had been clogged, and offered Thompson a maintenance contract, pursuant to which All-South would come to the facility every two or three months, check the drains and clean them.  (*Id.* at 33.)  Thompson declined the contract, explaining that it would simply have Thompson employees perform those tasks in-house.  (*Id.*)

All-South's operations manager, Bennie Goldman, reviewed the report and photographs taken by the All-South crew responding to the March 2014 service call.  Goldman was aware that an All-South employee inspecting the roof that day had been "up to his knees in water" and that the drains on the Thompson roof "collected debris and stuff."  (Goldman Dep., at 109, 111.) Within a few days, All-South's president, John Stewart, learned of the Thompson service call and the presence of approximately 12 inches of water backed up against the parapet wall. (Stewart Dep. Vol. II (doc. 43, Exh. N), at 48-49.)  Stewart viewed this circumstance as a "big deal" about which people in the All-South office were "upset" and "bothered."  (*Id.* at 49.) According to Stewart, All-South identified the problem in March 2014 as "[t]he roof drains being clogged," and All-South advised Thompson of the problem of clogged roof drains and the concomitant need to keep them clean and free of obstructions, such that "the owner was well notified of the problem."  (*Id.* at 51-52.)  However, All-South neither recommended that Thompson install scuppers in the parapet wall, nor indicated that such a secondary drainage system was necessary or appropriate.  (*Id.* at 53.)[7]  There is also no indication in the record that Thompson solicited input or recommendations from All-South as to whether any corrective action was available other than periodically cleaning out the roof drains.  Indeed, neither side identifies evidence that Thompson ever inquired of All-South or anyone else about the

---

[7]     All-South's expert Richard Baxter testified it would not have been expensive to install scuppers in the parapet wall on the Thompson roof.  By his estimate, "[l]et's say there were six of them for six drains.  They could probably have been put in for 2,000, $2,500, without a ... problem."  (Baxter Dep., at 57.)

availability of secondary drainage devices to prevent rainwater from ponding at the base of the parapet wall during heavy storms if the drains became clogged.

### D. The Roof Collapse.

On May 2, 2016, during another heavy rainstorm, the southwest corner of the roof (the area where the sloping roof met the parapet wall) of Thompson's warehouse collapsed. (Lyles Dep. (doc. 43, Exh. M), at 30, 32.) All-South's position is that, as a matter of "common sense," "we do not feel that it would have collapsed the way it did without more of the drains being blocked." (Stewart Dep. Vol. I (doc. 43, Exh. C), at 82.) A theory espoused by Bennie Goldman (former operations manager at All-South) is that Thompson "failed to maintain the – the roofs and clean the debris and stuff off the drains, and the water backed up, and the structure couldn't handle it." (Goldman Dep., at 109.)

All-South expert Marc Barter offered several opinions concerning the cause of the roof collapse. For purposes of its Rule 56 Motion, Travelers accepts Barter's opinions as correct. Barter testified as follows: "The roof collapsed due to the accumulation of water on the roof." (Barter Dep., at 299.) As to the presence of corroded structural steel columns in the building, Barter opined that this may have been a contributing factor because "the column in the weakened state would have given it less resistance when a collapse was to occur." (*Id.*) Barter also testified to his opinion that if there were free-flowing scuppers set at an appropriate height off the roof, it is "probably the case" that the roof would not have caved in. (*Id.* at 219-20.)[8]

## II. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden

---

[8]     Elsewhere in his deposition, Barter opined that the roof collapse would not have occurred on the night of May 2, 2016 "if the scuppers had been present." (*Id.* at 131.)

of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III. Analysis.

As indicated *supra*, Travelers focuses its Motion for Partial Summary Judgment on four narrowly defined topics, to-wit: (i) whether the International Plumbing Code applied to the All-South's re-roofing work on the Thompson building in January 2010; (ii) whether All-South breached a duty of care in 2010 by failing to install scuppers under the International Plumbing Code; (iii) whether All-South breached a duty of care in 2014 by failing to advise Thompson of the need for scuppers; and (iv) whether the absence of scuppers was a proximate cause of the May 2016 roof collapse. Each will be addressed in turn.

### A. Whether the International Plumbing Code Applied to All-South's Work.[9]

All-South's work on the Thompson warehouse roof in January 2010 was governed by the 2006 International Building Code. Defense expert and lay witnesses alike have so acknowledged. (Barter Dep., at 112-13; Stewart Dep. Vol. I, at 62.) It is likewise undisputed that the International Building Code provides that "[d]esign and installation of roof drainage systems shall comply with the *International Plumbing Code*." (Doc. 43, Exh. J, § 1503.4.) The critical question, then, is whether All-South's roofing work at the Thompson facility qualifies as

---

[9] This question is not of merely academic interest. Travelers seeks a ruling that the International Plumbing Code governed All-South's work because that Code has specific requirements about scuppers. (*See* doc. 43, Exh. K, § 1107.1 ("Secondary (emergency) roof drains or scuppers shall be provided where the roof perimeter construction extends above the roof in such a manner that water will be entrapped if the primary drains allow buildup for any reason.").) Thus, if the Court were to grant summary judgment to Travelers on the question of whether the International Plumbing Code applies, then the Code might furnish a duty of care against which All-South's acts and omissions could be evaluated.

"design and installation of roof drainage systems" under the International Building Code. Those terms appear not to be defined in the Building Code.

In seeking summary judgment on this point, Travelers asserts that "[b]ased on the undisputed testimony of All-South's employees and experts, All-South was clearly the designer and installer of the new drainage system for the roof." (Doc. 41, at 11.) Travelers' reasoning appears to be as follows: (i) before All-South's work in January 2010, the Thompson roof's drainage system consisted of an internal gutter and six downspouts; and (ii) All-South modified the drainage system by filling in the existing gutter with solid material, fabricating and installing drain inserts with raised screens for each of the downspouts, and adding crickets to direct the flow of water toward the drains. Thus, Travelers would equate All-South's alteration of the drainage characteristics of the roof with "design and installation of roof drainage systems" pursuant to § 1503.4 of the Building Code.

In relevant part, All-South's response is twofold.[10] First, All-South identifies the statement in its November 2009 proposal wherein it notified Thompson, "We exclude any electrical, **plumbing**, mechanical or HVAC work." (Doc. 43, Exh. A (emphasis added).) All-South's position is that "[d]rainage is plumbing" (Stewart Dep. Vol. I, at 90), so its bid proposal excluded any drainage work that might be subject to the International Plumbing Code.[11] The

[10] There is actually a third component to All-South's response on this point, in which it cites record evidence that it has no plumbing expertise, that its policy forbids employees from giving drainage opinions, and that it strongly believes it is not bound by the International Plumbing Code. (Doc. 51, at 13.) Such facts, even if accepted as true for summary judgment, do not help All-South because they are not germane to the question presented. The issue is not what All-South's practices, policies and beliefs were; rather, the issue is whether the actual tasks that All-South performed on the Thompson roof in January 2010 constitute "design and installation of a roof drainage system" within the meaning of the 2006 International Building Code. If that question is answered affirmatively, then by the clear terms of the Building Code, the International Plumbing Code applied to this project, irrespective of what All-South thought, believed, intended or instructed its employees to do or not to do. This strand of evidence relied on by All-South may thus be discarded for Rule 56 purposes as immaterial to the narrow question raised by Travelers' Motion.

[11] It bears noting that All-South's stance on the relationship between drainage and plumbing is a moving target within its summary judgment filings. For example, in arguing this issue, All-South specifically asserts that "[d]rainage is considered plumbing," then four sentences later seemingly contradicts itself by stating that "[t]he gutter and downspouts is a type of drainage system, not plumbing." (Doc. 51, at 13.) Defendant can't have it both ways.

trouble with this argument is that the applicability *vel non* of the Plumbing Code hinges not on what All-South wrote in its proposal, but on the work it actually performed. There was, after all, a significant divergence between the two.[12] If the roofing work performed by All-South on Thompson's roof constituted the "design and installation of a roof drainage system," then the International Plumbing Code applies by the plain language of § 1503.4 of the International Building Code, and the proposal's purported exclusion of plumbing work is of no consequence for this specific issue. Stated differently, what matters is not what All-South told Thompson it was or was not going to do, but rather what All-South actually did. The exclusion of plumbing work from the November 2009 proposal is neither dispositive of, nor instructive to, the question of whether the International Plumbing Code applied to the work All-South actually performed on Thompson's roof.

Second, All-South relies on the opinions of its roofing expert, Richard Baxter, who testified that altering or modifying an existing drainage system does not subject a roofing company to the International Plumbing Code. (Baxter Dep., at 13.) Baxter further opined that "[t]he crickets are part of the roof system …, not a part of the drainage system." (*Id.* at 15.) When asked directly whether All-South's work on the Thompson roof in January 2010 required compliance with the International Plumbing Code, Baxter answered in the negative and offered the following explanation:

> "But essentially, all All-South did was basically, convert an existing perimeter drainage system to make it work. … I will go back and read the code. But I don't see that as being a part of that.
>       *                 *                *
> "The drainage system existed. The drainage system was there already. All they did was make corrective action for what was rotted out and otherwise – you know, nonfunctional, to get the water off the roof."

---

[12] In particular, All-South's bid proposal said nothing about filling in the existing gutter, fabricating and installing drain inserts, or fashioning crickets to direct the flow of water toward the drains. Yet that is what All-South did. Similarly, the bid proposal provided that All-South's scope of work would include "[l]in[ing] the internal gutters with membrane," but All-South actually did nothing of the sort. The point is simple: In applying § 1503.4 of the International Building Code to this project, we must look to the work that All-South actually performed, even (and perhaps especially) where it deviated from the written terms of the November 2009 proposal.

(Baxter Dep., at 108-09.)  In response to the question "So you don't believe that is designing and installing the drainage system on this roof?" Baxter answered succinctly, "No."  (*Id.* at 109.)

Travelers hastens to observe that Baxter's opinions are not unanimously held by other experts involved in this case.[13]  For example, plaintiff's expert Daniel Sheehan wrote in his report that "All-South was the installer and became the designer when they converted the existing gutter and downspout system ….  By redesigning the original system, they were bound to follow the provisions of the 2006 IBC and 2006 IPC."  (Doc. 55, Exh. D at 2.)  But showing a mere difference of opinion among dueling expert witnesses as to the applicability (or lack thereof) of the International Plumbing Code does not entitle Travelers to partial summary judgment on that question.

In sum, everyone agrees that All-South's work on the Thompson roof in January 2010 was subject to, and performed under, the 2006 International Building Code.  By the clear language of § 1503.4 of that Code, All-South's activities were also subject to the International Plumbing Code if and only if All-South were engaged in the "design and installation of a roof drainage system."  Travelers argues that by fabricating drain inserts, filling in the gutter, and adding crickets, All-South effectively designed and installed a roof drainage system.  All-South, by contrast, offers expert testimony that what All-South did in January 2010 was simply the modification or correction of an existing drain system, not the design and installation of a roof drainage system, such that All-South's activities were beyond the purview of § 1503.4 and therefore the International Plumbing Code.  Genuine issues of material fact require that this question be submitted to the finder of fact.  On this record, with conflicting expert opinions and a dearth of official clarification of the meaning of the phrase "design and installation of a roof drainage system" as used in § 1503.4 of the Building Code, the Court cannot determine as a matter of law whether the International Plumbing Code governed All-South's activities on the

---

[13]     Another All-South expert, Marc Barter, testified that "[g]enerally," All-South's "installation of the components of the roof drainage system must comply with the plumbing code."  (Barter Dep., at 256-57.)  However, that testimony was not fleshed out to elicit specific opinions from Barter as to whether the particular work performed by All-South on the Thompson roof in January 2010 constituted "design and installation of a roof drainage system" within the meaning of § 1503.4 of the 2006 International Building Code.

Thompson roof in January 2010.  Accordingly, Travelers' Motion for Partial Summary Judgment is **denied** on this issue.

> **B.**     ***Whether All-South Breached a Duty in 2010 by Not Installing Scuppers under the International Plumbing Code.***

The Court's determination that genuine issues of material fact preclude any conclusive determination as a matter of law that All-South was bound to comply with the International Plumbing Code is likewise dispositive of the second issue raised in Travelers' Rule 56 Motion. Again, Travelers framed the issue as follows: "in 2010, All-South breached its duty of care by failing to install scuppers under the International Plumbing Code."  (Doc. 40, at 1.)

To be sure, the International Plumbing Code would require scuppers in circumstances such as the Thompson warehouse, whose sloping roof ended in a three-foot parapet wall where trapped water would tend to pool if the primary drains became clogged with debris.  (*See* doc. 43, Exh. K, § 1107.1 ("Secondary (emergency) roof drains or scuppers shall be provided where the roof perimeter construction extends above the roof in such a manner that water will be entrapped if the primary drains allow buildup for any reason.").)  But the threshold issue is whether the Plumbing Code even applies, and the Court has already found that Travelers is not entitled to judgment as a matter of law on that question.  Given the existence of genuine issues of material fact as to whether the International Plumbing Code governed the Thompson roofing work performed by All-South in January 2010, Travelers is not entitled to summary judgment on the related question of whether All-South's failure to install scuppers under the International Plumbing Code was a breach of duty.  After all, if the International Plumbing Code is ultimately found not to apply here, then All-South's noncompliance with the inapplicable § 1107.1 could not constitute a breach of duty imposed by that Code.[14]

---

[14]     In briefing Travelers' Motion, both parties appear to assume that, if the Plumbing Code did apply to All-South's re-roofing project at the Thompson warehouse, then All-South's failure to comply with § 1107.1 (requiring secondary roof drains or scuppers) would necessarily constitute a breach of duty for negligence purposes under Alabama law.  The Court need not decide the validity of that assumption at this time; however, a line of Alabama authorities casts doubt on that proposition.  *See Parker Bldg. Services Co. v. Lightsey ex rel. Lightsey*, 925 So.2d 927, 932-33 (Ala. 2005) ("[W]e are not persuaded by the weight of jurisdictions applying the negligence per se theory to building-code violations. … [I]f the trial court had properly instructed the jury on prima facie negligence, then the jury would have been instructed to determine (1) whether the ordinances had been violated and (2) whether that violation constituted negligence …. With the proper instruction, ***the jury could have found that the***
(Continued)

Accordingly, Travelers' Motion for Partial Summary Judgment is **denied** as to the issue of whether "in 2010, All-South breached its duty of care by failing to install scuppers under the International Plumbing Code." There are genuine issues of material fact as to whether the Plumbing Code applies to All-South's work on the Thompson warehouse roof in 2010. Moreover, Travelers has not met its burden of showing that under Alabama law, violations of the International Plumbing Code (where it applies) conclusively constitute breach of a duty of care so as to give rise to liability under principles of negligence, as to opposed to simply being evidence of a lack of due care, as discussed in footnote 14.

    C.    *Whether All-South Breached a Duty in 2014 by Not Advising Thompson of the Need for Scuppers.*

The third issue raised in Travelers' Rule 56 Motion is its contention that "in 2014, regardless of the application of the International Plumbing Code, All-South breached its duty of care by failing to advise Thompson of scuppers." (Doc. 40, at 1.) Again, All-South employees responded to a service call at Thompson for a roof leak on March 28, 2014. When All-South employees arrived, they found approximately 12 inches of standing water pooled against the parapet wall on the roof, and all six downspouts completely clogged with debris and organic material. Although All-South employees cleaned out the drains and alleviated the undesirable pooled water condition, All-South did not advise Thompson on this occasion that placing scuppers in the parapet wall was necessary or advisable as a secondary drainage mechanism to prevent this condition from recurring if and when the drains became clogged. Instead, All-South simply offered Thompson a maintenance plan – which Thompson declined – to keep the drains cleaned out on a routine basis.

---

*violations of the Building Code in this case did not constitute negligence*.") (emphasis added); *see generally Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) ("Appellant's compliance with both federal regulations and industry practices is some evidence of due care."); *Dunn v. Wixom Bros.*, 493 So.2d 1356, 1359 (Ala. 1986) ("The law in Alabama … is that customary practices or standards do not furnish a conclusive test of negligence."); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 3189242, *21 n.39 (S.D. Ala. June 7, 2016) (under Alabama law, code compliance "is merely evidence of due care," such that "a defendant may be adjudged liable on a negligence theory whether or not its conduct was code-compliant"). These cases appear to support the proposition that under Alabama law, a defendant's noncompliance with an applicable building code or industry standard is not conclusive on the subject of negligence, but is merely "some evidence" of a lack of due care.

The critical question for summary judgment purposes is whether All-South had a duty of care in March 2014 to advise Thompson about the potential benefits of installing scuppers. Both sides concur that expert testimony is helpful (or even necessary) to delineate the standard of care where, as here, the subject matter is beyond the understanding and experience of a typical juror. *See, e.g., Insurance Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1298 (11th Cir. 2012) (under Florida law, plaintiff "was required to present evidence on the standard of care in the roofing industry – either by expert testimony or by presenting testimony of roofing custom. Expert testimony is required to define the standard of care when the subject matter is beyond the understanding of the average juror").[15]

Review of the summary judgment record in the light most favorable to the non-movant confirms the presence of substantial expert testimony that the applicable standard of care did not obligate All-South to propose scupper installation to Thompson in March 2014. For example, defense roofing expert Richard Baxter opined that he "would have probably done the same thing" that All-South did in March 2014 by telling Thompson they needed to keep the drains clean to prevent this problem. (Baxter Dep., at 58.)[16] When pressed by plaintiff's counsel about

---

[15]     *See also Downs v. U.S. Army Corps of Engineers*, 517 Fed.Appx. 717, 721 (11th Cir. Apr. 19, 2013) ("In the absence of expert testimony about the standard of care among engineers, we cannot conclude that the Corps violated a standard of care."); *Goolsby v. Gain Technologies, Inc.*, 362 Fed.Appx. 123 (11th Cir. Jan. 21, 2010) ("Expert testimony is *required* in cases of professional negligence where the subject matter is beyond the familiarity of the average layperson. … Expert testimony is required because the court and jury are not permitted to speculate as to the standard against which to measure the acts of the professional in determining whether he exercised a reasonable degree of care.") (citations and internal quotation marks omitted); *Watson, Watson, Rutland/Architects, Inc. v. Montgomery County Bd. of Educ.*, 559 So.2d 168, 173 (Ala. 1990) ("[A]n architect is a 'professional,' and we are of the opinion that expert testimony was needed …. Just as in cases dealing with an alleged breach of a duty by an attorney, a doctor, or any other professional, unless the breach is so obvious that any reasonable person would see it, then expert testimony is necessary in order to establish the alleged breach."); *Brantley v. International Paper Co.*, 2017 WL 3325085, *1 (M.D. Ala. Aug. 3, 2017) ("expert testimony is required to establish the appropriate standard of care concerning matters involving specialized knowledge that is outside the common experience of a layperson").

[16]     In response to a direct question about whether he thought it was necessary for All-South to tell the owner in March 2014 that "[t]his needs to be taken care of," Baxter testified, "I think they did that." (*Id.* at 67.) The clear implication, of course, is that the expert witness's opinion was that by stressing the importance of keeping the drains cleaned out, All-South told Thompson all they needed to tell Thompson to "take care of" the problem.

-14-

whether he would have also talked to Thompson about scuppers, Baxter said, "I'm not sure that I would have. I typically accept existing conditions. And I typically don't get into interfering with structures." (*Id.* at 59.) Baxter's testimony was very clear that "[t]he average [roofing] contractor accepts what is there. And certainly, the repair guys are not in a position to make recommendations for anything." (*Id.*) When Travelers' counsel later re-plowed the same ground by asking "Do you believe that a roofing contractor should provide recommendations for corrective action when they are doing work on the roof?" Baxter's answer was, "No. I think you make specific recommendations on what you are asked to do, not something else." (*Id.* at 128.) Baxter expounded that All-South, as a "typical roofing contractor," likely would not have "had the talent to do that," meaning to recommend secondary drainage systems for the Thompson roof in March 2014. (*Id.* at 132.) Considered in the aggregate, this testimony from Baxter plainly creates a genuine issue of material fact on the question of whether All-South, as a typical roofing contractor, owed a duty of care to recommend installation of scuppers to Thompson in connection with the March 2014 service call for standing water on the roof.

Notwithstanding the foregoing, Travelers' position on summary judgment is that "[a]ccording to Defendant's own roofing expert, All-South should have advised Thompson in 2014 regarding scuppers but negligently failed to do so." (Doc. 41, at 15.) To reach this conclusion, Travelers magnifies a sliver of Baxter's deposition in which he was asked about a hypothetical assuming direct involvement by the highest levels of management and supervision within All-South.[17] As part of that hypothetical, Baxter was asked, "[W]ould you expect the supervisor or the estimator … to have told Thompson, … you probably ought to have an emergency overflow in here somewhere …? Would you expect someone in a supervisory capacity … to make that offer to Thompson in that situation, where you have 12 inches of water up on your roof?" (Baxter Dep., at 137.) After All-South's counsel objected to the form of the question (because it had been asked and answered multiple times already), Baxter responded,

_____

[17] From the outset of this line of questioning, Baxter pushed back by saying, for example, "I don't know what [John Stewart's] involvement in this was" and "I don't know how involved John was in this." (Baxter Dep., at 133.) Plaintiff's counsel responded by indicating, "This is a hypothetical question. I'm asking you to assume he knew about it." (*Id.* at 134.) As the evolving hypothetical wore on, plaintiff's counsel added qualifiers such as "if there were a management or supervisor onsite that knew about the condition, as opposed to just a laborer/technician." (*Id.* at 135.)

"Yeah. I think it should have been made when they were in the process of reroofing." (*Id.*) For summary judgment purposes, Travelers is essentially asking this Court to accept this excerpt of Baxter's deposition testimony as true and to reject abundant testimony from the same deposition in which Baxter opined that an average roofing contractor like All-South would not be expected to make recommendations about installing secondary drainage systems in the circumstances presented here.

In an attempt to harmonize the apparent inconsistency in his deposition testimony, Baxter executed an affidavit on February 23, 2018. In this document, Baxter explains that in responding to questions about Travelers' hypothetical, he was making assumptions that either All-South's president, John Stewart, or other All-South operations supervisory personnel were "actually involved in communications with Thompson, and having personally seen what was going on and communicated directly with the service mechanics and personally viewed the building." (Baxter Aff. (doc. 53), Exh. Z, ¶ 7.) In other words, Baxter's Affidavit clarifies that in testifying to what All-South "should" have suggested to Thompson, Baxter was assuming within the hypothetical posed by Travelers' counsel that All-South's operations supervisory personnel were extensively, personally, directly involved in the Thompson project. Because Baxter concludes those assumptions do not align with the facts, as established by the deposition transcripts of All-South representatives, Baxter explains in his Affidavit that "it is still my opinion as stated several times in my deposition prior to those hypothetical questions that All-South met its obligations as a roofer to Thompson, and met the standard of care for the average roofing contractor." (*Id.*)

Travelers maintains that the Baxter Affidavit must be discarded on summary judgment for three distinct reasons. (Doc. 57, at 9-12.) None are persuasive. First, Travelers characterizes the Baxter Affidavit as an untimely disclosure of expert opinions that must therefore be stricken. There is ample authority for the proposition that untimely expert opinions submitted by supplemental report or affidavit are impermissible.[18] It is equally true, however, that such

---

[18] *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (where supplemental expert "affidavits and report were untimely filed," opining that "the district court did not abuse its discretion in excluding them"); *Potish v. R.J. Reynolds Tobacco Co.*, 2017 WL 5952892, *3 (S.D. Fla. Nov. 30, 2017) ("Courts have broad discretion to exclude untimely-disclosed expert witness testimony even if they are designated as 'supplemental reports.'") (citations omitted); *Walker v. Yamaha Motor Co.*, 2016 WL 7325525, *2 (M.D. Fla. Jan. 20, 2016) ("Affidavits from expert witnesses, which are served after the deadline for disclosing (Continued)

affidavits are typically allowed if they do not offer new expert opinions but simply clarify or explain previously given opinions. *See, e.g., Rockhill-Anderson v. Deere & Co.*, 994 F. Supp.2d 1224, 1239 (M.D. Ala. 2014) ("Deere's motion to strike is due to be denied. … The overall opinions expressed in the affidavits are consistent with previously disclosed reports and deposition testimonies."); *Green v. Five Star Manufacturing, Inc.*, 2016 WL 1243757, *3 (N.D. Ala. Mar. 30, 2016) ("courts also have denied motions seeking to preclude consideration of expert affidavits on untimeliness grounds where the affidavits did not offer new opinions"). Such is the case here. The Baxter Affidavit cannot reasonably be viewed as disclosing new or different opinions from those he disclosed previously; therefore, the Court will not strike the affidavit on untimeliness grounds pursuant to Rule 37(c), Fed.R.Civ.P.[19]

Second, Travelers invokes the "sham affidavit" rule as a basis for negating the Baxter Affidavit. Pursuant to this principle, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Croom v. Balkwill*, 645 F.3d 1240, 1253 n.18 (11th Cir. 2011). The sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case," and is properly used only where there is an "inherent inconsistency between an

---

expert reports and also contain new opinions and/or restructure the original expert opinions may be stricken as untimely.").

[19]     In a footnote in its Reply, plaintiff requests that if the Baxter Affidavit is not stricken, then Travelers should be allowed (i) to submit a new affidavit from expert Charles Whitley for purposes of opposing All-South's pending *Daubert* motion, and (ii) "to re-depose Baxter at All-South's expense." (Doc. 57, at 10 n.6.) The first prong of this request is superfluous. As a general rule, prior leave of court is not needed for Travelers to file materials it deems appropriate on the pending *Daubert* motion, provided that such filings are subject to being stricken if they do not comport with applicable procedural rules. At any rate, the applicable briefing schedule has long since closed on the *Daubert* motion, so whatever Travelers wanted to file in opposition to such motion should have been filed long before now. The Court will not reopen briefing on that motion simply because Travelers now deems it unfair that All-South was allowed to submit a supplemental expert affidavit in connection with briefing on a different (and unrelated) motion. The second prong of Travelers' request is denied. Nothing about the Baxter Affidavit – which, again, is aimed solely at clarifying and harmonizing facial discrepancies in his deposition testimony – would warrant the remedy of allowing Travelers to depose him a second time, much less to do so on defendant's dime.

affidavit and a deposition." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (citations omitted). No such "inherent inconsistency" exists here. On the contrary, the Baxter Affidavit on its face simply clarifies and explains an anomaly in his prior deposition testimony by identifying the assumptions underlying the excerpt of his testimony on which Travelers' Rule 56 Motion seizes. This kind of explanation of ambiguous deposition testimony is entirely permissible under the rules, and is not a proper subject for kneejerk application of the draconian sham affidavit rule. Travelers' objection is not well-taken.

Third, Travelers quarrels with the substance of the Baxter Affidavit by stating it is "filled with errors" about what All-South managers/supervisors knew and what their involvement in the Thompson project was. Travelers objects that Baxter's stated understanding of facts gleaned from his review of the record is inaccurate, and that the record facts actually conform to the stated assumptions underlying Baxter's opinion (offered in response to Travelers' hypothetical) that All-South management should have advised Thompson about scuppers. In other words, Baxter uses his Affidavit to distance himself from the opinion that All-South management should have talked to Thompson about scuppers by saying the assumptions underlying the hypothetical scenario as to which that opinion was given were at odds with the facts. Travelers' retort is that the facts are actually consistent with those assumptions, such that Baxter should not be able to use his Affidavit to retreat from the opinion in that way. Upon careful consideration, the Court is convinced that this matter is properly addressed on cross-examination, not via summary rejection of the Baxter Affidavit. It is reasonably possible to construe the record in a manner that diverges from Baxter's stated assumptions. Whether that divergence is material and the precise nature of Baxter's assumptions are issues properly taken up at trial. As such, they do not form a viable basis for summarily disqualifying the Baxter Affidavit on Rule 56 review.[20]

---

[20] Much of Travelers' position on this point is rooted in debatable argument, not uncontroverted fact. For example, Travelers argues that "All-South should have known" that scuppers were missing from the Thompson roof "and that is enough to sink the ship." (Doc. 57, at 12.) This flies in the face of Baxter's clearly expressed opinions that an average roofing contractor hired to perform a specific job does not concern itself with inspecting other aspects of the roofing/drainage system, much less forming and volunteering opinions about same. According to Baxter's deposition testimony, "that's the engineer's job, figure out the location and the type of drains and size," not a roofer's job. (Baxter Dep., at 50.) Baxter also opined that All-South "had a right to assume" that the Thompson roof drainage system "would continue to work for a bunch more years" because it had been working for 30 years already. (*Id.* at 51.) (Continued)

Notwithstanding the insufficiency of Travelers' efforts to negate the Baxter Affidavit as a matter of law, even if the Court were to exclude the Baxter Affidavit from the summary judgment calculus (which it has not and does not), the result would remain the same. As noted *supra*, Baxter repeatedly testified during his deposition that an average roofing contractor would not have done any more than All-South actually did on the Thompson job. (Baxter Dep., at 58-59, 128, 132.) Moreover, defense expert Marc Barter testified, "[I]f what we're talking about is, generally, what duty does a tradesman have to a customer to advise them as to upgrades to their building, I'm not sure tradesmen have that responsibility." (Barter Dep., at 75.)[21] Implicit in Travelers' Rule 56 Motion is the idea that all of this expert testimony favorable to All-South on the issue of standard of care should be ignored for summary judgment purposes, in favor of the morsel extracted from the Baxter deposition that suits Travelers' purposes. Travelers cites no authority for the proposition that a summary judgment movant who has the burden of proof at trial is allowed to pick and choose the record evidence that it likes and disregard the rest for purposes of its Rule 56 motion. Even under Travelers' theory, the record as a whole (as opposed to a selective reading of only the parts most favorable to the movant) demonstrates a fact question as to whether All-South owed a duty of care to Thompson to make suggestions about installing scuppers in connection with the March 2014 service call.

For these reasons, Travelers' Motion for Partial Summary Judgment is **denied** as to the issue of whether "in 2014, … All-South Breached its duty of care by failing to advise Thompson of scuppers." (Doc. 40, at 1.)

_____

And Baxter testified, "I typically accept existing conditions. … And I typically don't get into interfering with structures. … The average contractor accepts what is there." (*Id.* at 59.) All of these expert opinions asserted by Baxter in his deposition are fundamentally incompatible with Travelers' premise that All-South should have known about the presence or absence of secondary drainage systems on the Thompson roof and should have conducted an investigation into those matters even when it was on-site for a different, very specific purpose. Genuine issues of material fact abound.

[21] Elsewhere in his deposition, Barter confirmed his view that roofing companies are "like any other tradesmen." (*Id.* at 108.)

**D.** ***Whether the Lack of Scuppers was a Proximate Cause of the Roof Collapse.***

The fourth and final issue as to which Travelers seeks partial summary judgment is that "the lack of scuppers was a proximate cause of the roof collapse." (Doc. 40, at 1.) Travelers offers substantial evidence in support of this proposition, including most notably the testimony of All-South's expert Marc Barter. In relevant part, Barter opined that the Thompson roof would not have collapsed on May 2, 2016 if scuppers had been installed in the parapet wall. (Barter Dep., at 219-20.) Confronted with this evidence and Travelers' argument that "the lack of scuppers was a proximate cause of the collapse" (doc. 41, at 18), All-South remains silent. All-South identifies no record evidence from which a reasonable finder of fact could conclude that the Thompson roof would have collapsed even if scuppers were present, and advances no argument on the proximate cause issue.[22]

At trial, Travelers would bear the burden of proof on causation. As such, at the summary judgment stage, Travelers "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Rich v. Secretary, Florida Dep't of Corrections*, 716 F.3d 525, 530 (11th Cir. 2013) (citation omitted). On the issue of whether the lack of scuppers was a proximate cause of the roof collapse, Travelers has indeed made such an affirmative showing. Plaintiff having done so, "it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (citation omitted). All-South has not made that showing. It has not come forward with significant, probative evidence from which a finder of fact could conclude that the lack of scuppers was not a proximate cause of the roof collapse. Accordingly, Plaintiff's Motion for Partial Summary Judgment is **granted** on the issue of whether "the lack of scuppers was a proximate cause of the roof collapse." (Doc. 40, at 1.)

---

[22]    At best, All-South devotes a section of its brief to arguing that "[t]here is evidence of Thompson's negligence which a jury could determine caused or contributed to cause the roof collapse." (Doc. 51, at 21.) However, that assertion does not directly address the issue at hand. Travelers' Motion does not ask this Court to find that the lack of scuppers was the sole cause of the roof collapse, or to make a final determination on summary judgment that Thompson was not contributorily negligent. Rather, Travelers seeks summary judgment on the issue that "the lack of scuppers was a [as opposed to 'the'] proximate cause of the roof collapse." All-South's briefing does not address that issue.

**IV.    Conclusion.**

For all of the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (doc. 40) is **granted in part**, and **denied in part**.  The Motion is **granted** as to the causation issue presented, and the Court finds on this record as a matter of law that the lack of scuppers was a proximate cause of the roof collapse at the Thompson warehouse on May 2, 2016.  The jury will be instructed to that effect at trial.  In all other respects, the Motion is **denied**.

DONE and ORDERED this 13th day of April, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE