**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **TRAVELERS PROPERTY CASUALTY** ) | |
| **COMPANY OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 17-0041-WS-B** |
| ) | |
| **ALL-SOUTH SUBCONTRACTORS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on Defendant All-South Subcontractors, Inc.'s Motion to Exclude Testimony from Charles Whitley (doc. 45) and Defendant All-South Subcontractors, Inc.'s Motion for Summary Judgment (doc. 46). Both Motions have been extensively briefed and are now ripe for disposition.

**I. Background.[1]**

  **A. *Nature of the Case.***

---

[1]   The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Thus, for purposes of the Motion for Summary Judgment, plaintiff's evidence is taken as true and all justifiable inferences are drawn in its favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, as to the Motion for Summary Judgment, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Travelers'] version of the facts drawing all justifiable inferences in [Travelers'] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

On the evening of May 2, 2016, a heavy rainstorm swept through southwestern Alabama. Such weather events are not uncommon in this area; indeed, an oft-cited statistic crowns Mobile, Alabama as the rainiest city in the United States. Nonetheless, this weather event was significant. During the storm, the roof of a warehouse building owned by non-party Thompson Tractor Company in Spanish Fort, Alabama collapsed. The roof collapse damaged not only the warehouse structure, but also the Caterpillar tractor parts inventory stored inside. Thompson's insurer, plaintiff Travelers Property Casualty Company of America, investigated the loss and ultimately paid out over $1 million in insurance benefits to Thompson.

As subrogee under the applicable insurance policy, Travelers, standing in the shoes of its insured, filed suit against defendant All-South Subcontractors, Inc., to recover the insurance proceeds paid to Thompson. Travelers' theory is that All-South is responsible for Thompson's roof collapse because All-South had performed re-roofing services on that building in 2009-2010, and had responded to a service call from Thompson for a roof leak in 2014. Travelers' Complaint (doc. 1) pleads the following claims against All-South: (i) negligence and negligence *per se*, alleging that All-South failed to exercise reasonable care in performing work on the Thompson roof (Count I); (ii) negligent misrepresentation, alleging that All-South falsely represented to Thompson the work that it would perform, as well as the standard and end results of that work (Count II); (iii) breach of contract, alleging that All-South breached its contract with Thompson by failing to inspect, maintain, repair and/or replace the subject roof as agreed (Count III); and (iv) breach of express and implied warranties, alleging that Thompson breached a 15-year express warranty on the subject roof, breached the promises and warranties contained in its advertising materials, and breached implied warranties of fitness and merchantability under Alabama law (Count IV).

Following the close of discovery, All-South filed a Motion for Summary Judgment, arguing that legal and/or factual defects in each of Travelers' causes of action entitle All-South to entry of judgment in its favor. Notably, in seeking summary judgment on Count I (negligence), All-South relies heavily on its contention that the opinions proffered by Travelers' structural engineering expert, Charles E. Whitley, P.E., must be excluded, and that in the absence of Whitley's opinions no reasonable finder of fact could determine that All-South breached a duty of care owed to Thompson. In furtherance of that argument, All-South filed a separate

Motion to Exclude Testimony from Charles Whitley, which forms the starting point of this Court's analysis given its central importance to All-South's Rule 56 Motion.

### B. The Opinions of Charles Whitley.

After being retained by Travelers and conducting a site inspection of the Thompson warehouse on May 12, 2016 (ten days after the roof collapse), Whitley authored a written expert report dated May 16, 2016. In that document, Whitley recited measurements and calculations concerning the drainage capacity of Thompson roof (which, based on the size of the drain openings and a 100-year hourly rainfall total of 4.5 inches, totaled 1,726 square feet of roofing for each of the six drains), as compared to the minimum drainage requirements of the 2009 International Plumbing Code (which Whitley calculated at 2,236.8 square feet of roofing for each of the six drains). On that basis, Whitley opined, "The calculations of the required drain sizes showed that the drains on the roof did not meet the requirements of the 2009 IPC." (Doc. 48, Exh. U, at 2.) In that same report, Whitley observed that "[t]here were no overflow drains in the south side parapet wall," and that "[t]he lack of overflow drains is a violation of the 2009 IPC." (*Id.* at 3.) Whitley's May 2016 report concluded, "The improper sizing of the roof drains and the lack of overflow drains are code violations that contributed to, and may be the sole cause of, the damage to the structure." (*Id.*) He also noted the need for a weather analysis to determine whether excessive rainfall might have been a contributing factor.

Whitley prepared a brief follow-up report on July 12, 2016, addressing the specific issue of whether corrosion discovered in a column near the center of the south wall of the warehouse structure and in structural steel members over the loading dock may have contributed to the roof collapse. (Doc. 54, Exh. B.) In the July 2016 report, Whitley explained that, after review of photographs and other information provided by Thompson, his opinion was this question was properly answered in the negative. In particular, Whitley reasoned, the corroded structural members were along the west face of the loading dock, but (i) "the west face of the loading dock is structurally independent of the warehouse," and (ii) "there was no collapse of the loading dock." (*Id.* at 2.) As for the corroded column near the center of the south wall, Whitley observed that "columns near the center of the south wall were intact and in their original position after the collapse," so as to warrant a conclusion that "[w]ith the corroded column located in an area that was intact, the corrosion of the south wall column played no role in the collapse." (*Id.*)

On July 31, 2017, Whitley completed a more comprehensive written report on the Thompson roof collapse. The July 2017 report described in considerable detail the configuration of the roof and its drainage features both prior and subsequent to the All-South re-roofing project of January 2010. Whitley went on to explain in the July 2017 report the basis for his conclusion (gleaned from review of applicable codes as well as his understanding of the specific tasks performed by All-South) that All-South's work on the Thompson roof was governed by, and subject to, the 2006 and 2009 International Plumbing Code. (Doc. 48, Exh. Q, at 3-5.)[2] The July 2017 report also set forth the grounds for Whitley's conclusion, based on review of the International Plumbing Code and calculations of the drainage capabilities, that the roof's drainage capacity after All-South's work in January 2010 did not comport with the Code. (*Id.* at 5-8.) As part of that analysis, Whitley opined that the drain inserts installed by All-South had reduced the drainage capacity of the subject drains by 9%. (*Id.* at 8.) In Whitley's view, "the reduction of the size of the downspouts created by the installation of the inserts is a violation of the intent of" the Plumbing Code. (*Id.* at 8-9.) Whitley's July 2017 report also observed that the drain strainers installed by All-South did not extend the requisite four inches above the roof surface, and that "[t]he lack of a strainer that extended not less than four inches above the roof surface is a code violation." (*Id.* at 9.) Whitley further reiterated his previous conclusion that "[w]hen All-South designed and installed the roof drainage system at the facility, they were required by the 2006 and 2009 IPC to install secondary or emergency roof drains," but they failed to do so. (*Id.*)

In sum, Whitley's July 2017 report documented four distinct violations of the Plumbing Code (*i.e.*, insufficient drainage capacity, improper reduction in drainage capacity, insufficient strainers, and lack of secondary drains) that were embodied in All-South's re-roofing project of January 2010. The conclusion of the July 2017 report was succinctly set forth as follows: "The above listed code violations resulted in an accumulation of water on the roof of the facility. The

---

[2]     In part, Whitley reasoned as follows: "The work done by All-South replaced 100 percent of the original roofing system, and replaced all but one component, the down spouts, of the original drainage system. … ***Based on the scope of the work that was done in the recovering of the existing roofing, All-South designed and installed a roof drainage system at the facility.*** With All-South having designed and installed a roof drainage system, according to the requirements of the 2006 and 2009 IBC, the work done by All-South in 2010 should have complied with the requirements of the 2006 and 2009 IPC." (*Id.* at 5 (emphasis added).)

accumulation of water on the roof overloaded the structural system, resulting in the observed damage to the structure." (*Id.* at 10.)

## II. All-South's Motion to Exclude Travelers' Expert Whitley.

In a multi-pronged Motion to Exclude, All-South contends that Whitley's proffered opinions should be barred under *Daubert* principles. Specifically, All-South asserts that Whitley is not qualified to testify about structural load/capacity of the Thompson warehouse, code compliance, or causes of the roof collapse; that Whitley's methodology lacks the requisite reliability to assist the trier of fact; and that Whitley cannot testify about the applicable standard of care in the roofing industry.

### *A. Legal Standard.*

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005). In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). "The proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder …, by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 808 (11th Cir. 2017) (similar). "While there is inevitably some

overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them." *Rosenfeld v. Oceana Cruises, Inc.*, 654 F.3d 1190, 1193 (11ᵗʰ Cir. 2011) (citation omitted).

Courts have emphasized that "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11ᵗʰ Cir. 2005). Moreover, a district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury." *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11ᵗʰ Cir. 2013) (citations omitted). Even in the aftermath of *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citations omitted). "[I]n most cases, objections to the inadequacies of a[n opinion] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (citations omitted). Thus, disagreements as to the manner in which an expert performs an analysis may best "be aired out in front of the jury and tested by the crucible of cross-examination," without implicating the *Daubert* gatekeeping function. *Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1185 (11ᵗʰ Cir. 2013).

## B. Challenge to Whitley's Qualifications.

As the first ground for its Motion to Exclude, All-South maintains that "Whitley is not qualified to testify competently" about matters of building load/capacity, code compliance, or causation of the roof collapse. (Doc. 45, at 4.) Certainly, before an expert's opinions may be admitted, "the expert must be qualified on the matter about which he intends to testify." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11ᵗʰ Cir. 2014). The Eleventh Circuit has explained that "experts may be qualified in various ways, including by scientific training, education, and experience." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11ᵗʰ Cir. 2016) (citation and internal quotation marks omitted).

Notwithstanding the manner in which this objection is framed, All-South identifies no factual basis for questioning Whitley's qualifications to testify about these particular matters. To the contrary, All-South concedes that "generally Whitley's education, training and experience as being a professionally licensed structural engineer would qualify him to testify as to his analysis and resulting opinions as to structural roof issues." (Doc. 45, at 6.) All-South goes on to clarify

that its objection is to Whitley's "failure to perform even the basic evaluations, measurements, calculations and testing – or, stated otherwise, his complete failure to use any methodology." (*Id.*) That is a reliability/methodology objection, not a qualifications objection. As noted *supra*, these are distinct concepts in the *Daubert* analysis which must not be conflated. This objection is also redundant of the methodology challenge presented in a separate section of All-South's Motion. As such, defendant's objection purporting to allege that Whitley is not qualified to render opinions in this case is **overruled**, and that aspect of the Motion to Exclude is **denied**.

### C. Challenge to Whitley's Methodology.

Over a 12-page span, All-South's Motion to Exclude identifies multiple respects in which it contends that "[t]he methodology by which Charles Whitley reaches his conclusions is not sufficiently reliable under *Daubert* and his testimony will not assist the trier of fact." (Doc. 45, at 7.) The "reliability" prong examines "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon*, 813 F.3d at 988 (citation omitted). In determining whether an expert's methodology is reliable, courts consider "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *Id.* (citations omitted). However, this list is not exhaustive, and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Knight*, 856 F.3d at 809 (citation omitted). At all times in this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate." *Seamon*, 813 F.3d at 988 (citation omitted).

As an initial salvo, All-South contends that Whitley's opinion that All-South was responsible for the roof collapse was reached during his initial telephone call with Traveler's claims adjuster on May 10, 2016. According to All-South, Whitley formed this opinion "without performing any investigation or analysis" and "did not consider other possible causes." (Doc. 45, at 7.) The deposition testimony runs directly to the contrary. Indeed, Whitley testified that, as to causation of the roof collapse, he "had not made any determination on May 10, 2016." (Whitley Dep. (doc. 48, Exh. D), at 60-61.) Although All-South says that Whitley wrote on a

form on May 10, 2016 "Cause (work in 2010),"[3] Whitley's testimony was exceedingly clear that he had not reached any determinations as to cause on that date, that his notation on the form was simply "referencing work that was done in 2010 as something to be considered," and that he considered other potential causes "as the investigation was done." (Whitley Dep., at 62.) Given the clarity of Whitley's explanation, All-South cannot exclude his opinions on the theory that "it is abundantly clear" Whitley reached a final causation opinion "without performing any investigation or analysis" and that he "did not consider other possible causes." (Doc. 45, at 7.) At trial, defendant is free to cross-examine Whitley about the form and the meaning of particular notations.

Next, All-South faults Whitley for failing to undertake "to determine the correct applicable building code," and cites Whitley's acknowledgment in his deposition that "[d]epending on what code the county is using, it could make a difference." (Doc. 45, at 8; Whitley Dep., at 71.) Defendant is correct that Whitley's analysis revealed uncertainty as to whether the 2006 or the 2009 iterations of the International Building Code or the International Plumbing Code were applicable. Indeed, in his July 2017 report, Whitley noted that if the Thompson warehouse were located in Spanish Fort, Alabama, then the 2009 Codes applied as of January 2010, but that if it were located in an unincorporated area of Baldwin County, then the 2006 Codes governed. (Doc. 48, Exh. Q, at 3.) Whitley's July 2017 report analyzed code compliance under both the 2006 and the 2009 iterations of the Codes, finding no pertinent differences between the two. (*Id.* at 3-10.)[4] On this showing, there is no reason to believe that the reliability of Whitley's opinions is diminished one whit by his failure to isolate whether the 2006 or the 2009 versions of the Codes applied, because his analysis was performed with reference to both and was unchanged either way.

---

[3] This form, which All-South describes as a "case opinion form" and Travelers terms a "case opening form," does not appear to have been furnished to the Court by either side in briefing the *Daubert* Motion.

[4] Indeed, Whitley observed in his July 31 report that, as between the 2006 and 2009 versions of the Codes, "[t]he terminology of both codes listed below is the same" in all material respects. (*Id.* at 3.) All-South has pointed to no language in the codes suggesting that Whitley's analysis or conclusions might have been materially impacted had he focused exclusively on the 2006 iterations of the Codes and excluded the 2009 Codes as inapplicable, as All-South contends he should have done.

All-South also criticizes the methodology underlying Whitley's opinion that corrosion did not cause the roof collapse, saying that Whitley failed to take physical measurements of the corrosion or perform any tests on the corroded steel. (Doc. 45, at 9-12.) Defendant is correct that Whitley did not physically measure the corroded structures; indeed, he readily admitted that omission, and explained that "didn't feel a need to" take such measurements in forming his causation opinions. (Whitley Dep., at 103-04.) Nonetheless, All-South's argument falters because it identifies no evidence or reasoning as to why Whitley's failure to quantify corrosion undermines the reliability of his methodology. Notably, All-South's own structural engineer, Marc Barter, offered opinions as to the impact of corrosion on the roof collapse based solely on "[t]he appearance of the column," without taking measurements because he decided "it was not feasible." (Barter Dep. (doc. 54, Exh. F), at 90, 271, 273.)[5] Just because Whitley <u>could</u> have taken measurements does not mean that he <u>must</u> do so in order to offer opinions to a reasonable degree of structural engineering certainty as to the role (if any) played by corrosion in the Thompson roof collapse.

Whitley testified that he was aware of corrosion to one column in an area where collapse occurred, but his opinion was that this corrosion did not cause the collapse because of "the timing of the collapse, the nature of the collapse, the fact that there were two separate areas of collapse." (Whitley Dep., at 104, 122.) He elaborated on his reasoning in his written report of July 12, 2016. (Doc. 54, Exh. B.) In preparing that report, Whitley "reviewed the location where the corrosion had occurred, … the photographs provided, … [and] previous information on the reports." (Whitley Dep., at 113.) The Court understands that All-South vigorously disputes Whitley's conclusion, but the proper *Daubert* inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *Seamon*, 813 F.3d at 988 (citation omitted). Based on the evidence presented, it appears that site inspections and review of photographs is an appropriate, reliable methodology utilized by both sides' structural engineering

---

[5]     A fair summation of Barter's testimony on this point is that he believed corrosion "did weaken one of the columns" in the Thompson warehouse, that "there was other corrosive steel in that building" that Barter believed had no impact, and that any attempt to quantify those determinations "would have been a difficult proposition" that he did not undertake, in any event. (*Id.* at 305-06.)

experts in forming opinions as to corrosion's impact on the roof collapse. The Court will not disallow this aspect of Whitley's opinions as unreliable.[6]

All-South's Motion also takes Whitley to task for not calculating the volume of water on the roof at the moment of collapse. (Doc. 45, at 13-16.) For example, All-South argues that, "Unbelievably, Whitley admits he reached his conclusions as to … the cause of the roof collapse without performing any calculations as to water volume or weight." (*Id.* at 14.)[7] Movant is correct that Whitley did not calculate the weight or volume of water on the Thompson warehouse roof at the time of collapse. (Whitley Dep., at 158, 161, 165, 196.) Travelers' rejoinder is straightforward, to-wit: No such calculations are needed because both sides are in agreement that the roof collapse was caused by the accumulation of water on the roof. That statement of the

---

[6]      There appears to be a fundamental disagreement between the experts as to whether one badly corroded column was located at the specific failure point or not. That dispute does not appear to stem from divergent methodology that might require judicial intervention on *Daubert* review, but is rather the product of different structural engineers using similar methodology to reach different results. Under the circumstances, both competing expert opinions are properly submitted to the jury for consideration. In its *Daubert* Motion, All-South makes much of its contention that "Whitley visited the warehouse site on three occasions and still <u>chose not to</u> take the measurements," whereas defense structural engineer Barter "<u>was not allowed</u> additional access to the site to complete his investigation of the structural members …." (Doc. 60, at 5.) This argument misses the point for *Daubert* purposes. Whitley and Barter both formed opinions about the role of corrosion in the roof collapse. Both used similar methodology in forming those opinions. That fact undercuts All-South's argument that Whitley's methodology is not reliable. It makes no difference whether Whitley and Barter used the same methodology by choice or out of necessity. If Barter was able to form reliable corrosion opinions based on examination of photographs and limited physical inspection of the site, then that circumstance suggests a likelihood that Whitley could do so as well. *See generally Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 663-64 (S.D. Fla. 2012) ("While EFI's methodology is not dispositive on the question of the sufficiency of Calitu's process, where EFI and Calitu – both engineers – undertook essentially the same process for evaluating the cause of damage to the Property, that fact does suggest that the methodology enjoys at least some acceptance in the engineering community.").

[7]      Variations of this theme abound in All-South's Motion. (*See* doc. 45, at 15 ("However, he did not feel it was necessary to determine the volume of water that accumulated on the roof … in order to determine the cause of the collapse. … Whitley could have made such a determination as part of his investigation of this incident, but instead simply <u>chose not to do so</u>.") (emphasis in original), 16 ("<u>Whitley concludes that the weight of the water on the roof was significant enough to collapse the roof, but has never calculated the weight.</u>") (emphasis in original).)

parties' positions is accurate.[8] Nonetheless, All-South insists that "the 'why' is important to the outcome of this case." (Doc. 60, at 6.) Of course, that statement is also correct. Where All-South's argument breaks down is in the lack of any reasoned showing why mathematical calculations of the total water volume on Thompson's roof are necessary to form reliable opinions as to causation of that water accumulation. For his part, Whitley (much like defendant's structural engineering expert) appears to have assumed more than 12 inches of water had accumulated because the Thompson roof did not collapse in March 2014 when it was observed to have 12 inches of standing water along the parapet wall, and the building was in substantially the same condition prior to the collapse in May 2016. (Whitley Dep., at 164; Barter Dep., at 72, 217-18.) Why does a structural engineer require more precise data of the amount of water accumulation in order to evaluate the cause of a roof failure? Why is it not sufficient to make a reasonable assumption based on undisputed facts that the water volume must have been in excess of 12 inches? Defendant does not say.[9] For his part, Whitley testified that his

---

[8]     Indeed, All-South's structural engineer, Marc Barter, wrote in his report, "There is little doubt that the accumulation of water on the roof caused its collapse." (Doc. 53, Exh. BB, at 5.) Barter testified even more bluntly in his deposition, "The roof collapsed due to the accumulation of water on the roof." (Barter Dep., at 299.) In its reply, All-South acknowledges that "Defendant agrees generally that the accumulation of water on the roof caused the collapse." (Doc. 60, at 6.)

[9]     Also, it bears noting that All-South misstates Whitley's opinions by repeatedly suggesting in its briefs that Whitley ascribes the roof collapse solely to the 9% reduction in drain size resulting from All-South's installation of drain inserts. (*See* doc. 45, at 17 ("Whitley has completely failed to show … *how* the code violation relating to the reduction of drain sizes by 9% caused conditions that led to the roof collapse."); doc. 47, at 24 (asserting that Whitley "is comfortable with asserting his own conclusory statements as to causation of the roof collapse, based solely on the presence of an alleged code violation regarding drain sizing"); doc. 60, at 6 ("Again, he simply wants to rely on the drain opening sizes in violation of the IPC and ignore any other evidence …."). In fact, Whitley's July 2017 report identified not one, but four code violations (reduced drain size, improper strainers, insufficient roof drain capacity, and lack of secondary drains), then stated, "The above listed code violations resulted in an accumulation of water on the roof of the facility." (Doc. 48, Exh. Q, at 10.) Likewise, in his deposition, Whitley was quite clear in expressing his opinion that "[t]he *violations* of the building code resulted in an accumulation of water on the roof." (Whitley Dep., at 181 (emphasis added).) Recall that one of the violations identified by Whitley was the absence of a secondary drainage system (*i.e.*, scuppers) on the Thompson roof's parapet wall. All-South's structural engineering expert, Marc Barter, readily agreed that if "there were free flowing scuppers that were set at the appropriate height off the roof," then "[w]e wouldn't be sitting here today with a building collapse." (Barter (Continued)

causation opinions linking code violations to the roof collapse were "based on my inspection of the facility, based on the calculations that I've done, based on my previous experience, and based on the condition of this structure." (Whitley Dep., at 182.) For aught the record shows, that is a reasonable, reliable methodology for a structural engineer to use in forming causation opinions.

Even more fundamentally, Travelers maintains that any such water volume calculations would have necessarily suffered from false precision and would have been unreliable because they hinge on facts that are unknown and unknowable. For example, Whitley explained that he could not calculate how high the water rose on the roof "[b]ecause I have to have the moment-by-moment [rainfall] intensities in order to make that calculation," which data does not exist. (Whitley Dep., at 159.) Whitley elaborated that in order to use hourly rainfall data to perform such calculations, he would have had to make "an assumption with no basis whatsoever that the rainfall intensity was consistent throughout that hour." (*Id.* at 160.)[10] Similarly, any calculations about water accumulation that night would have required data concerning the extent to which the six Thompson roof drains were clogged. According to Whitley, he did not observe any clogged drains on the roof and had "no information to show that there was any clogs." (Whitley Dep., at 170-71.) Defendant's roofing expert, Marc Barter, likewise testified, "I don't know," when asked whether all six drains were blocked to some extent, and further responded "I do not," when

_____

Dep., at 219-20.) Thus, the idea that drainage design issues (including the lack of scuppers) were a cause of the accumulation of water that led to the roof collapse is a notion that the parties' experts all appear to accept. To be sure, whether those design problems are attributable to All-South (as opposed to the original designer/builder of the Thompson roof three decades earlier) is a critical area of divergence between the parties, as is the presence or absence of other contributing factors (such as corrosion or Thompson's alleged failure to maintain or clean out the downspouts). But Whitley's opinion that a combination of design problems (including the lack of scuppers) was a cause of the accumulation of water on the Thompson roof does not appear controversial.

[10]     All-South's roofing expert, Richard Baxter, appeared to concur with Whitley on this point, as he testified, "Neither I nor anybody besides maybe God could figure out how much water was coming down that night." (Baxter Dep. (doc. 54, Exh. G), at 83.) In Baxter's view, it was not possible to determine how much water had accumulated "unless you had a rain gauge or other instruments up there" during the storm. (*Id.* at 84.) Yet All-South urges this Court to exclude Whitley's opinions under *Daubert* because Whitley declined to make calculations that would have been dependent on precisely "how much water was coming down that night."

asked if he knew how many drains were clogged. (Barter Dep., at 178-79.) Given the incomplete or nonexistent data relating to these and other necessary variables for the water accumulation calculations, Travelers has a compelling argument that it was reasonable for Whitley to refrain from attempting such inherently suspect, unreliable calculations in forming causation opinions.

Finally, in its most stinging rebuke of Whitley's methodology, All-South argues that "Whitley did nothing" other than to "offer[] his sweeping 'expert' opinions … without any supporting scientific or technical methodology," such that "Whitley cannot offer any basis for his findings." (Doc. 45, at 16.) That is not a fair characterization of the evidence. Uncontroverted record evidence reflects that Whitley took the following steps, among others, in forming his structuring engineering opinions in this case: (i) he inspected the site for more than seven hours on May 11 and 12, 2016, less than two weeks after the collapse, during which time he took measurements, field notes and photographs, and viewed the site from various vantage points (Whitley Dep., at 65-66, 67-68); (ii) he inspected the site for an additional three hours on June 14, 2016, at which time he took additional measurements and photographs, went up in a lift to inspect the roof, and examined all columns in the building (*id.* at 77-78, 80-83); (iii) he inspected the site on a third occasion on July 1, 2016, focusing on the drainage system, taking photographs and collecting physical evidence (drain inserts and collars) (*id.* at 87-88); (iv) he spoke with Thompson representative Mike Reuter and reviewed additional photographs depicting corrosion on the structure on July 5, 2016 (*id.* at 107-08); (iv) he conducted a laboratory examination of collected materials and reviewed the file on July 13, 2016 (*id.* at 126-27); (v) he prepared detailed calculations of drainage capacity on the Thompson roof (*id.* at 136; doc. 54, Exh. D & E); and (vi) he prepared multiple reports setting forth his opinions. Such evidence is irreconcilable with All-South's insistence that "Whitley did nothing" but conjure his opinions out of thin air.

It is true, of course, that Whitley did not perform all the calculations that All-South says he could have. However, the issue for a *Daubert* methodology challenge is not what it was possible for an expert to do, but rather what it was reasonably necessary for an expert to do in order for his opinions to be reliable. Plaintiff's evidence is that Whitley did not need to perform additional calculations to reach his conclusions, and that certain calculations touted by defendant would have been mere window dressing, imbuing his opinions with a false air of mathematical

precision which they do not and cannot have.  Besides, courts have recognized that an engineer's use of techniques of visual inspection, code review, and reliance on experience and expertise can satisfy the *Daubert* reliability prong.  *See, e.g., Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 664 (S.D. Fla. 2012) (structural engineer's "experience as an engineer and his visual inspection of the Property … lay a permissible foundation" for his opinions as to causation of roof damage).[11]

For all of these reasons, the Court finds that Whitley's methodology is sufficiently reliable to pass muster under *Daubert*.  Whitley conducted multiple in-depth visual inspections of the site of the roof collapse, including the drains, the lack of scuppers, the location and extent of corrosion in each of the building's columns, and the like.  He computed the drainage capacity of the roof.  He reviewed and applied building and plumbing codes.  He relied on his knowledge and experience as a structural engineer to conclude that the identified code violations (taken collectively) caused the accumulation of water that resulted in the Thompson roof's collapse, and

---

[11]     *See also Kirksey v. Schindler Elevator Corp.*, 2016 WL 5213928, *11 (S.D. Ala. Sept. 21, 2016) (finding no *Daubert* problem with industrial engineer's methodology in visually inspecting escalator guardrail without performing testing or analysis of its structural strength); *Nicholson v. Pickett*, 2016 WL 854370, *9-11 (M.D. Ala. Mar. 4, 2016) (finding expert's methodology sufficiently reliable, despite lack of testing, where expert visually inspected vehicle, reviewed depositions, films and reports, and relied on his experience in the industry); *Holman v. State Farm Fire and Cas. Co.*, 2015 WL 12803770, *7 (N.D. Ala. Jan. 12, 2015) (where defendant argued that structural engineer failed reliability prong because he did not take measurements or make calculations, ruling that expert's "methodology is sufficiently reliable" where it is based on "first-hand inspection" of the house and applied "knowledge and experience of structural engineering to reach his conclusion" as to cause of cracks in basement wall); *Sparger v. Newmar Corp.*, 2014 WL 3928556, *5 (S.D. Fla. Aug. 12, 2014) ("visual inspection of an engine may be an acceptable way of identifying an engine defect for purposes of evaluating admissibility of expert testimony," even where expert did not perform any "intrusive diagnostic procedure"); *Altieri v. State Farm Fire and Cas. Co.*, 2011 WL 1883054, *3-4 (E.D. Pa. May 17, 2011) (finding structural engineer's methodology sufficiently reliable where, in forming opinion about cause of wall collapse, he "made first-hand observations of the collapse and applied his knowledge and experience of structural design and engineering to reach conclusions regarding the cause of the collapse," even though his "report lacks engineering jargon"); *Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096149, *5 (S.D. Fla. Dec. 20, 2011) (where architect assessed cause of damage to windows, "[t]he application of his experience during a visual inspection was an appropriate methodology," even though there were other steps he could have taken but did not); *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 2009 WL 1046354, *3 (M.D. Fla. Apr. 20, 2009) (rejecting reliability challenge to architect's opinions that were "[b]ased on his visual inspections, with no measurement or other testing").

that the presence of corrosion in the structure did not cause the collapse. The ostensible shortcomings identified by All-South in Whitley's methodology may be proper fodder for cross-examination; however, defendant's objections go to weight, rather than admissibility, of Whitley's opinions. After all, it is well-settled that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence;" rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citation omitted). Insofar as defendant's Motion to Exclude is predicated on the reliability prong of *Daubert*, then, the Motion is **denied**.

> **D.** *Challenge to Whitley's Opinions about Standard of Care in Roofing Industry.*

Defendant's final asserted ground for the Motion to Exclude is that Whitley "is not a roofing expert" and therefore "cannot offer any opinions as to the roofing industry standard of care." (Doc. 45, at 19.) All-South is certainly correct that Whitley acknowledged that he is "not a roofing contractor" and disclaimed any qualification to offer opinions as to standard practice for roofing contractors for the installation of a roofing system. (Whitley Dep., at 208-09.)

Nonetheless, All-South's argument is not persuasive because it fails to identify any "expected testimony from Charles Whitley regarding any roofing industry requirements, standards or violations." (Doc. 45, at 19.) Review of Whitley's expert reports does not reveal him opining directly on the topic of roofing industry standards. Rather, Whitley's July 2017 report included the following opinions: (i) the January 2010 roofing work performed by All-South met the International Building Code's definition of a "roof recovering;" (ii) as such, that work was subject to the requirements of Chapter 15 of the IBC; (iii) pursuant to § 1503.4 of the IBC, design and installation of roof drainage systems must comply with the International Plumbing Code; (iv) the January 2010 roofing work performed by All-South constituted "design and installation of a roof drainage system," so the IPC applied; (v) that work violated the IPC in four distinct, enumerated respects; (vi) those enumerated code violations resulted in the accumulation of water on the Thompson roof; and (vii) the accumulation of water overloaded the structural system and resulted in the roof collapse on May 2, 2016. (Doc. 48, Exh. Q, at 3-10.) None of these opinions appear to exceed the scope of Whitley's qualifications as a structural engineer or to require direct knowledge of the "standard practice for roofing contractors." At

any rate, All-South has advanced no argument that Whitley is not qualified to testify as to the proper application of the Building and Plumbing Codes to a particular job, or to the causation of observed damage to a structure. In short, given the Code-based framing of Whitley's opinions, All-South's generic objection to his lack of expertise "regarding roofing issues" (doc. 54, at 13) is not well-taken.[12] This aspect of the Motion to Exclude is, therefore, **denied**.

### III.   All-South's Motion for Summary Judgment.

Related to its Motion to Exclude Testimony from Charles Whitley, All-South has also filed a Motion for Summary Judgment (doc. 46). Recall that Travelers' Complaint is couched in theories of negligence and negligence *per se*, alleging that All-South failed to exercise reasonable care in working on the Thompson roof (Count I); negligent misrepresentation, alleging that All-South falsely represented to Thompson the work that it would perform and the standard and end results of that work (Count II); breach of contract, alleging that All-South breached its agreement with Thompson by failing to inspect, maintain, repair and/or replace the subject roof as promised (Count III); and breach of express and implied warranties, alleging that Thompson breached an express warranty on the subject roof, breached promises and warranties contained in its advertising materials, and breached implied warranties of fitness and merchantability under Alabama law (Count IV). All-South seeks summary judgment on each of these counts. The Court will evaluate All-South's Rule 56 Motion on a claim-by-claim basis, considering record facts as appropriate for each asserted cause of action.[13]

---

[12]     This determination rests on a crucial distinction. Defendant may well be correct that Whitley is not qualified to offer direct opinions as to a roofer's standard of care. But that is not what Whitley has done in this case. Instead, Whitley has opined that All-South's work violated the IBC and IPC in specific respects. Code violations themselves may be evidence of breach of a duty of care under Alabama law. *See generally Kirksey v. Schindler Elevator Corp.*, 2016 WL 3189242, *21 n.39 (S.D. Ala. June 7, 2016) (under Alabama law, code compliance "is merely evidence of due care," such that "a defendant may be adjudged liable on a negligence theory whether or not its conduct was code-compliant"). Whitley is qualified to offer opinions as to whether All-South's work on the Thompson roof complied with applicable codes, and those opinions properly bear on the applicable duty of care, notwithstanding Whitley's acknowledgment that he is not a roofing contractor and cannot testify to standard practice for roofing contractors in Alabama.

[13]     Of course, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. All-South, as the movant, bears "the initial burden to (Continued)

### A.    *Count I: Negligence / Negligence* **Per Se.**

In Count I of the Complaint, Travelers alleges that All-South "failed to exercise reasonable care with respect to the work it performed on the subject roof," that its "conduct fell below the applicable standard of care," and that its "failure to meet the requirements of the 2009 IPC also constitutes negligence *per se*." (Doc. 1, ¶¶ 49-51.)

As an initial matter, All-South seeks summary judgment on the negligence *per se* aspect of Count I. All-South's position is well-supported by Alabama law. Again, Travelers maintains in the Complaint that All-South's noncompliance with the International Plumbing Code constitutes negligence *per se*. The Alabama Supreme Court has unequivocally rejected that proposition. For violation of a statute or ordinance to constitute negligence *per se*, that statute or ordinance "must have been enacted to protect a class of persons, of which the plaintiff is a member." *Parker Bldg. Services Co. v. Lightsey ex rel. Lightsey*, 925 So.2d 927, 931 (Ala. 2005). The *Parker Bldg. Services* Court held that "[t]he purpose of the Building Code is to protect the general public. Because the first element of the doctrine of negligence *per se* is not met, negligence *per se* is not applicable to violations of the Building Code in this case." *Id.* at 932. In light of this authority, Travelers properly concedes that its negligence *per se* claim is not cognizable under current Alabama law. (Doc. 55, at 8.) Accordingly, All-South's Motion for Summary Judgment is **granted** as to the negligence *per se* portion of Count I.

The great majority of All-South's argument for summary judgment on Count I, consuming some 13 pages of argument in its principal brief, is that Travelers lacks reliable evidence of negligence by All-South because Whitley's opinions "are not properly founded on any accepted testing, design, research or investigation and should be disregarded in their totality." (Doc. 47, at 13-26.) In so asserting, All-South revisits in great detail its separately filed *Daubert* Motion concerning Whitley's testimony and opinions. For the reasons discussed

---

show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If All-South satisfies that initial responsibility, then the burden shifts to Travelers to show the existence of a genuine issue of material fact. "If the nonmoving party fails to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof, the moving party is entitled to summary judgment." *Id.* (citation, footnote and internal quotation marks omitted).

in Section II, *supra*, the Court has already concluded that Whitley's expert opinions set forth in his written reports and deposition testimony comport with *Daubert* reliability principles. The Court declines to rehash these issues on summary judgment, where All-South appears to have simply repackaged and restated the same or similar arguments already litigated, considered and adjudicated in the context of the *Daubert* Motion. Whitley's expert testimony will not be excluded wholesale under Rule 702; moreover, his opinions constitute evidence from which a reasonable finder of fact could determine that All-South breached a duty of care in performing re-roofing work on the Thompson warehouse in January 2010 by violating the International Building Code and Plumbing Code in multiple respects. Thus, defendant is not entitled to summary judgment on the negligence portion of Count I.[14]

---

[14]    As an aside, it bears noting that Charles Whitley is not Travelers' only liability expert. Daniel T. Sheehan, P.E., a structural engineer appearing here in the capacity of a rebuttal expert, submitted a written report dated January 3, 2018, in which he opined in part as follows: (i) "All-South was the installer and became the designer" of the Thompson roof's drainage system, such that "they were bound to follow the provisions of the 2006 IBC and 2006 IPC," which required addition of scuppers or secondary drains; (ii) "they could have easily installed the scuppers" in the course of performing the existing scope of work on the re-roofing project; (iii) All-South "had a second opportunity to inform Thompson" about the need for scuppers in March 2014, "and failed to do so;" and (iv) as a commercial roofing contractor, All-South "should know what the function of a roof drain and scupper is, and the importance of having secondary drainage on a low slope roof with parapet walls." (Doc. 55, Exh. D, at 2.) Citing conflicting authorities, the parties dispute whether the opinions of Sheehan, as a rebuttal expert, may properly be considered on summary judgment; however, the Court need not resolve that disagreement because Whitley's opinions provide ample evidence of negligence to allow Count I to proceed to trial. Nonetheless, the Court pauses to point out that, contrary to All-South's stated understanding (*see* doc. 61, at 6-7), there is no pending Motion to Exclude Sheehan's testimony and opinions. To be sure, All-South did file a Motion to Exclude (doc. 30) aimed at Sheehan on November 22, 2017. But that Motion was administratively terminated on December 21, 2017 when Magistrate Judge Murray entered an Order cancelling oral argument on the ground that "counsel for the parties hav[e] informed a member of the undersigned's staff that the parties have reached an agreement in writing resolving their dispute." (Doc. 35.) All-South now insists that it never withdrew its Motion to Exclude, that the parties never agreed to any resolution of its objections set forth in that Motion, and that its objections to Sheehan's testimony have been properly maintained and preserved at all times. (Doc. 61, at 6-7.) Remarkably, none of this appears to have been communicated to the undersigned – much less to Magistrate Judge Murray, to whom the original Motion to Exclude Sheehan's testimony was referred and who canceled oral argument on the Motion at the eleventh hour based on the parties' express assurances that such dispute has been resolved informally – by anyone until now. Be that as it may, the fact remains that there is no pending Motion to Exclude concerning Sheehan's testimony at this time. (Continued)

### B.    Count II: Negligent Misrepresentation.

In Count II of the Complaint, Travelers brings a claim for negligent misrepresentation.  In that claim, Travelers alleges that All-South "made numerous material misrepresentations to Thompson Tractor concerning the roof work that would be performed and the standard of said work." (Doc. 1, ¶ 54.)  On summary judgment, All-South argues that Count II must be dismissed because "Travelers has not offered any evidence of specific representations by All-South that were 1) false; 2) related to a material fact with the re-roofing project, that 3) resulted in damages."  (Doc. 47, at 27.)

In response, the only specific misrepresentations identified by Travelers are those found in a printout purportedly taken from All-South's website dated June 26, 2017.  (Doc. 55, at 9-10 & Exh. L.)  Travelers points to language on the website in which All-South made statements such as "[L]et us design the roof that best meets your needs;" "If there is an issue with your design, we will bring that to your attention immediately;" and "[O]ur inspections, done soon after such an event, will catch any issues early on and remedy them before they ever become a serious expense."  (Doc. 55, Exh. L, at 4, 8, 9.)  Travelers presents no evidence that these statements found on All-South's website in June 2017 were also present on that website in November 2009, when All-South entered into an agreement with Thompson; or in January 2010 or March 2014, when All-South performed work for Thompson.  More importantly, Travelers offers not a shred of evidence that anyone at Thompson was aware of, much less relied on, any All-South website representations at any time.  Of course, reasonable reliance is an essential element of a negligent misrepresentation claim.  *See, e.g., Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) ("the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies") (footnote omitted); *Medical Park Station, LLC v. 72 Madison, LLC*, 216 So.3d 453, 457-58 (Ala.Civ.App. 2016) ("To recover in a fraud action …, a plaintiff must prove that he or she *reasonably relied* on the defendant's alleged misrepresentation.") (citations omitted).  Plaintiff points to no record evidence of such reliance on purported website representations.

--------

Should All-South wish to pursue objections to Sheehan that it contends have not been mooted or otherwise resolved, then it must file an appropriate motion within the timeframe specified by Paragraph 6 of the applicable Rule 16(b) Scheduling Order (doc. 22).

Nor does Travelers strengthen its position on Count II by citing deposition testimony of Thompson facility development manager Mike Reuter that he "trusted [All-South's] judgment, and they were the specialists, the roofing specialists, and … I would assume if they were putting a roof on the building they would want to make sure it drained properly." (Reuter Dep. (doc. 55, Exh. J at 46.) Travelers identifies no specific representations from All-South on which Reuter relied in forming that trust or making those assumptions. Likewise, Travelers' contention that "All-South held itself out as an experienced and knowledgeable company" (doc. 55, at 10) accomplishes nothing for Count II purposes absent evidence that it made representations to that effect to Thompson, that such representations were false, or that Thompson relied on those representations. Finally, Travelers weakly suggests that the maintenance contract All-South offered to Thompson provided for less frequent inspections than those required by the warranty issued by the roofing membrane's manufacturer. (Doc. 55, at 10.) Thompson declined that maintenance contract. (Doc. 53, Exh. V, at 25-26, 30.) If Thompson rejected All-South's maintenance contract, then it could not possibly have reasonably relied on the terms of that rejected contract to its detriment.

The bottom line is this: On summary judgment, Travelers has failed to identify a single specific false representation made by All-South on which Thompson reasonably relied. Accordingly, Count II fails as a matter of law. Defendant's Motion for Summary Judgment will be **granted** as to the negligent misrepresentation cause of action.

### C.    Count III: Breach of Contract.[15]

In Count III of the Complaint, Travelers asserts a claim for breach of contract. Citing the contract between Thompson and All-South pursuant to which All-South "agreed to provide work on the roof of the subject warehouse," the Complaint alleges that "[i]n breach of that contract, the Defendant did fail to inspect, maintain, repair, and/or replace the subject roof as agreed." (Doc. 1, ¶¶ 60, 62.) All-South now seeks summary judgment on Count III, reasoning that

_____

[15]    In a footnote, Travelers concedes that "some of its causes of action overlap" and expresses willingness to "elect its remedy" by proceeding to trial solely on the negligence claim. (Doc. 55, at 11 n.7.) Yet it also devotes considerable energy in its response brief to defending the merits of its other causes of action. Under the circumstances, the Court will address defendant's Rule 56 Motion on the merits as to each claim and cause of action presented. The topic of election of remedies should be addressed in the parties' Joint Pretrial Document and shall be discussed at the Final Pretrial Conference.

"Travelers has produced no evidence that All-South breached its contract with Thompson." (Doc. 47, at 28.)

There appears to be no dispute that All-South issued a written proposal for the re-roofing job to Thompson on November 10, 2009, and that Thompson accepted that proposal. As such, the November 10 proposal appears to set forth the terms of a binding contract between All-South and Thompson. In that proposal, All-South specified a scope of work that included "[l]ine the internal gutters with membrane." (Doc. 48, Exh. H.) All-South did not, in fact, line the internal gutter on the Thompson roof with membrane, but instead filled in that internal gutter with solid material. (Doc. 43, Exh. D, at #6; Goldman Dep. (doc. 48, Exh. J), at 129.) These are two different methods. (Goldman Dep., at 48-49.) All-South never even notified Thompson of this modification to the agreed-upon scope of work, much less obtained Thompson's approval or permission for that alteration. (*Id.* at 51.) Travelers maintains that All-South's deviation from the November 2009 agreement in this respect raises genuine issues of material fact as to whether All-South breached the contract, thereby precluding dismissal of Count III on summary judgment.

In response, All-South argues that its decision to fill in the Thompson gutter rather than line it with membrane was nothing more than a "minor deviation from the original scope of work," a mere "field decision" that was necessary to create a "water tight seal." (Doc. 61, at 13.) All-South advances no legal argument why a "minor" breach of contract made as a "field decision" negates the existence of a viable claim. To be sure, the Court is aware that under Alabama law, a breach-of-contract cause of action requires a material breach. *See, e.g., Sokol v. Bruno's, Inc.*, 527 So.2d 1245, 1248 (Ala. 1988) ("We are mindful of the law regarding a material breach of a contract. A material breach is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.").[16] On this record, a genuine issue of material fact exists as to whether All-South's act of filling in the gutter rather

---

[16]     *See also Abernant Fire Dep't v. Rhodes*, 21 So.3d 739, 744 (Ala.Civ.App. 2009) ("To succeed in a breach-of-contract action, a claimant must prove a material breach of the contract."); *Stockton v. CKPD Development Co.*, 936 So.2d 1065, 1078 (Ala.Civ.App. 2005) ("The elements that must be proven in a breach-of-contract action include the existence of a contract, *a material breach* of that contract by one party, and damage to the other party as a result of the breach.") (emphasis added).

than lining it with membrane amounts to a material breach of the November 2009 proposal, so as to be actionable on a breach-of-contract theory. After all, once that gutter on Thompson's roof was filled in by All-South, that gutter "does nothing. It's covered up." (Armstrong Dep. (doc. 43, Exh. B), at 81.) A reasonable finder of fact might conclude on this record that Thompson did not want the gutter on its warehouse roof to be reduced to a state of total ineffectuality, with concomitant effects on the roof's drainage characteristics. (Barter Dep. (doc. 43, Exh. F), at 111-12 (answering affirmatively when asked if All-South's act of filling in the gutter "affected the drainage characteristics of the building").)

In short, the written contract to which All-South and Thompson agreed included specific language regarding the nature of All-South's work to be performed on the warehouse roof gutter. There is record evidence that what All-South actually did to the gutter was completely different than the specifications of that agreement. These facts, and the accompanying genuine issues as to materiality, preclude entry of summary judgment in All-South's favor on the breach-of-contract claim set forth as Count III of the Complaint.[17]

### D.      *Count IV: Breach of Warranty.*

Finally, in Count IV of the Complaint, Travelers brings a claim against All-South for "Breach of Express and Implied Warranties." As pleaded, Count IV alleges that All-South "expressly and/or impliedly warranted to Thompson Tractor that the roof, component parts, and the maintenance performed were free of material defects, done in a professional, competent, and workmanlike manner." (Doc. 1, ¶ 67.) Count IV further alleges that All-South "expressly and/or impliedly warranted to Thompson Tractor that the roof, component parts, and the maintenance performed would be of excellent quality, merchantable and fit for the particular purpose intended." (*Id.*, ¶ 68.) Count IV goes on to identify "descriptions and advertisements" by All-

---

[17]      In opposing All-South's Motion for Summary Judgment as to Count III, Travelers also argues that All-South breached its contract with Thompson by failing to obtain the necessary permit from Baldwin County for the re-roofing project. (Doc. 55, at 11.) In its November 2009 proposal, All-South expressly stated, "We include all necessary licenses and permits." (Doc. 48, Exh. H, at 2.) During the discovery process, All-South "[a]dmitted that a permit from Baldwin County was required." (Doc. 43, Exh. D, at #33.) An All-South representative also acknowledged that no such permit was obtained. (Schaffer Dep. (doc. 55, Exh. F), at 49.) This aspect of All-South's apparent non-compliance with the terms of the contract thus raises genuine issues of material fact as to Count III, precluding entry of summary judgment in defendant's favor as to that cause of action.

South that Travelers says "became part of the basis of the bargain," and also cites "a fifteen-year warranty" furnished by All-South "for all of its labor and materials on the subject roof," all of which Travelers alleges gives rise to claim for breach of express warranties pursuant to Alabama Code § 7-2-313. (*Id.*, ¶ 69.) Further expanding the scope of Count IV, Travelers pleads that All-South "breached its warranties of fitness and for merchantability;" that "[t]he goods at issue were not merchantable, were not of fair quality, and were not fit for ordinary purposes." (*Id.*, ¶ 70.) On the basis of these and other allegations, Count IV pleads that All-South breached implied warranties pursuant to Alabama Code §§ 7-2-314 and 7-2-315. (*Id.*)

Faced with All-South's Motion for Summary Judgment as to Count IV, Travelers hastens to narrow the exceedingly broad scope of its breach-of-warranty cause of action as pleaded. In particular, Travelers disclaims any intent to predicate Count IV on the "one-year express warranty" provided by All-South. (Doc. 55, at 12.) Instead, Travelers clarifies that the only warranties animating Count IV are "the implied warranties of merchantability and fitness for a particular purpose." (*Id.*) To satisfy the implied warranty of merchantability under Alabama law, goods must "[p]ass without objection in the trade under the contract description" and must be "fit for the ordinary purposes for which such goods are used." Ala. Code § 7-2-314(2)(a),(c). Likewise, Alabama implies a warranty of fitness for a particular purpose "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Ala. Code § 7-2-315.

Travelers points to considerable record evidence from which a reasonable finder of fact could conclude that the drain inserts and strainer straps fabricated and installed by All-South would not pass without objection in the trade. For example, Charles Whitley stated in his expert report of July 31, 2017 that "reduction in the size of the downspouts created by the installation of the inserts" is a code violation, and that "[t]he system installed by All-South had no strainer that extended not less than four inches above the roof surface. The lack of a strainer that extended not less than four inches above the roof surface is a code violation." (Doc. 48, Exh. Q, at 9.) Defendant's expert Marc Barter acknowledged that the strainers and straps "have the capability of trapping pine straw and leaves." (Barter Dep., at 289.) This and other record evidence reveals the presence of genuine issues of material fact as to whether All-South's work violated the implied warranty of merchantability. As for the implied warranty of fitness for a particular

purpose, plaintiff's evidence is that Thompson relied on All-South's skill or judgment to select a re-roofing system that would drain properly. (Reuter Dep. (doc. 55, Exh. J), at 46-47 ("I trusted their judgment, and they were the specialists, the roofing specialists, and … I would assume if they were putting a roof on a building they would want to make sure that it drained properly."), 91 ("I believe getting water off of a roof is a roofer's responsibility," and "from their experience they would – surely would know how to get the water off the roof.").) And of course, Travelers has presented substantial evidence that the roofing system selected and installed by All-South was not fit for that purpose, such as expert testimony from Whitley of numerous code violations embedded in that system. (Doc. 48, Exh. Q.) Faced with this evidence and argument, the sum total of All-South's reply for why it seeks summary judgment on Count IV is that "[t]here is no citation to applicable case law for Plaintiff's opposition." (Doc. 61, at 14.) Movant advances no argument or reasoning why citations to case law are necessary given the clarity of the legal standard for these implied warranties as a matter of Alabama statute. Nor has All-South propounded any argument for why these enumerated record facts would not be sufficient to create genuine issues of material fact as to whether All-South breached the implied warranties of merchantability and fitness for a particular purpose.

In light of these concerns, defendant's Motion for Summary Judgment is **denied** as to the portions of Count IV that concern the implied warranties of merchantability and fitness for a particular purpose, but **granted** as to other express or implied warranties pleaded in Count IV of the Complaint.[18]

## IV. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

---

[18] As something of an afterthought, the parties skirmish in their summary judgment briefs about All-South's assertion that "Travelers completely and wholly disregards other identified causes of the warehouse roof collapse." (Doc. 47, at 29; *see also* doc. 55, at 13-14; doc. 61, at 14-15.) In a separate ruling issued on this date, the Court has found that Travelers is entitled to summary judgment on the issue of whether the lack of scuppers was a cause of the roof collapse. The parties' briefs as to All-South's Rule 56 Motion identify multiple disputes of fact as to other possible contributing causes of the loss. Those causation issues are the source of *bona fide* factual disagreements in the record, are not amenable to resolution via the summary judgment vehicle, and are properly submitted to the finder of fact at trial.

1.      Defendant All-South Subcontractors, Inc.'s Motion to Exclude Testimony from Charles Whitley (doc. 45) is **denied**;

2.      Defendant All-South Subcontractors, Inc.'s Motion for Summary Judgment (doc. 46) is **granted in part**, and **denied in part**;

3.      The Motion for Summary Judgment is **granted** as to the negligence *per se* portion of Count I, all of Count II (negligent misrepresentation), and the portion of Count IV (breach of warranty) concerning warranties other than Alabama's implied warranties of merchantability and fitness for a particular purpose, and those claims or portions of claims are **dismissed**;

4.      In all other respects, the Motion for Summary Judgment is **denied**; and

5.      This action remains set for Final Pretrial Conference on **July 10, 2018 at 9:00 a.m.**, with jury trial to follow in the **August 2018** civil term.

DONE and ORDERED this 13th day of April, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE